# O. A. PRESCOTT v. WALDO SWANSON.[1]

May 8, 1936.

Nos. 30,787, 30,788.

See 196 Minn. 298, 265 N. W. 39.

[1]Reported in 267 N. W. 251.

*H. L.* and *J. W. Schmitt* and *Charlotte Farrish,* for appellant.

*T. O. Streissguth, E. A. Hauser,* and *S. P. Gislason,* for respondent.

Julius J. Olson, Justice.

Two negligence cases, both arising out of the same accident, were tried together below and have been so submitted here.

A case involving the same accident had been tried at the same term and before the same jury panel. That case was recently before us, Swanson v. Swanson, 196 Minn. 298, 265 N. W. 39, the facts of which therein appear.

The two cases here involved were brought by the legal representative of the estates of August and Augusta Kroschel against Waldo Swanson, the same defendant named in the cited case. In each case plaintiff recovered a verdict of $5,000. The verdict in the Augusta Kroschel case was reduced by the trial court to $2,500 conditioned upon plaintiff's consent thereto. Plaintiff duly consented. Defendant's blended motion in each case for judgment notwithstanding or new trial having been denied, he appeals.

August Kroschel, Augusta, his wife, and their son Emil lost their lives in this unfortunate accident. They were the only occupants of the car owned and driven by Emil. Hence the only living eye-witnesses to the accident are the occupants of the car driven by defendant, *i. e.,* defendant, his wife, and brother.

The accident happened at the time and in the manner set forth in the reported case. Swanson v. Swanson, 196 Minn. 298, 265 N. W. 39. The complaint charges negligence on defendant's part, in substance: "That the locomotive of said train emitted large quantities of smoke and steam which, due to the direction of the wind and the condition of the atmosphere on said day, was blown over and upon said highway, where said automobiles were then and there traveling; that said train approached the automobile in which" the Kroschels "were traveling from the rear and that" the Kroschels were not aware "of its approach nor aware of said smoke and steam until about the instant of the collision  *  *  *; that the defendant, traveling in a westerly direction saw, or by the exercise of reasonable

diligence could have seen, the approaching train and the emission of smoke and steam from the engine thereof, and, by the exercise of reasonable care, could have observed the fact that said smoke and steam were being carried or blown upon and over said highway with such density as to obstruct the vision of travelers upon said highway; * * * that notwithstanding the premises, the defendant negligently and unlawfully drove his said automobile upon said highway at a high, excessive, and unlawful rate of speed into the smoke and steam then covering said highway and without slackening his speed, and then and there drove his automobile on the left of the center of said highway and negligently failed to give any warning or signal of any kind of his approach into and through said smoke and steam." Because of these alleged negligent acts plaintiff claims the collision occurred and as a result thereof caused the death of August, Augusta, and Emil Kroschel. Counsel stipulated that the Kroschels died in the following order: the father, August, first; Emil, the driver, next; and Augusta, the mother, last. All died on the day of the accident. August was past 67 years of age, Augusta past 68 years, and Emil 40 years. Both parents had always enjoyed good health. The life expectancy of the father was about ten years, that of the mother about nine years.

The court instructed the jury that the only next of kin of the deceased parents entitled to share in any recovery were two sons and a daughter. There was another son, August, Jr., who disappeared many years ago. The court instructed the jury that as to him no damages should be allowed.

The two sons Martin and Albert, aged, respectively, 38 and 39 years, are bachelors. Each owns his own farm with a full line of livestock and equipment. Both are hardworking and industrious. They have accumulated considerable property and have operated their respective farms over a period of several years. The daughter, Lilly Maas, aged 36, is married and has four children. Her husband, too, appears to be a hardworking, industrious, and prosperous farmer. All these children are, at least moderately, well to do. They are abundantly able to take care of themselves and have been doing so over a period of years.

The father left an estate inventoried at nearly $73,000, $46,000 of which consisted of cash and securities easily convertible into cash; and real estate of the value of $26,000, all free from debt. (There are other items of property, not necessary to enumerate, valued at a little less than $1,000.) As far as appears, the mother left no estate (except her interest under her husband's will) all property being in the name of the husband and father.

In 1931 the father had executed a will under the terms of which his property (except certain lands given to the son Emil) was given to the wife and mother. The fifth article of the will provides:

"I purposely omit to give anything of any nature to my children Albert Kroschel, Martin Kroschel, Lilly Maas, and August Kroschel, for the reason that the first three of said children have already received their just share of my estate, and it is not my desire to give anything to these four children by this will."

Several years prior to the death of the father he had conveyed a farm to each of his said two sons. In each conveyance the property was worth approximately twice the stated purchase price. The difference was in substance and effect a gift by the father to each son and amounted to from $6,000 to $10,000, depending upon the valuation one might place upon the respective farms when each deal was made. At the time of death approximately $2,500 was due the father from each of his sons. When the daughter was married she was given $500, and later he gave her $4,000, both gifts being in cash.

It was customary for both parents to render some slight service for each of these children, especially during threshing season. Both sons being bachelors, it is natural that the mother rendered them, from time to time, household services. As both parents were of advanced years, it is obvious that the actual money value of their services so rendered was negligible; also, it seems to us, such services in the future necessarily would become less as time went on.

Defendant has assigned many errors, so many in fact that to discuss all would extend this opinion beyond reasonable limits.

■ The first group of assignments relates to the claim that there is insufficient proof of actionable negligence on defendant's part to sustain any verdict for plaintiff.

In the Swanson case, 196 Minn. 298, 265 N. W. 39, the facts in respect of the happening of the accident are fully stated. We have refrained from repeating these. Plaintiff claims that the facts in the instant cases are somewhat different. The difference is indicated in the quotations we have made from the complaint. From the same it will be noted that defendant's liability is predicated upon excessive speed, failure to warn of his approach when coming into the dense smoke and steam emitted by the railway company's engine, and by crossing over the center line.

On the subject of excessive speed very little need be said. If each driver of these approaching cars kept upon his own side of the pavement it is obvious that, no matter what the rate of speed might be, there could be no' causal connection between such speed and the resulting accident.

The highway was one carrying extensive traffic. As such it is quite clear that it became the duty of the user of the highway to stay upon his own traffic lane and refrain from crossing over to his left or beyond same. No crossing or approach to any private roadway is involved.

Defendant testified that he was traveling at a rate of 40 to 45 miles an hour. He observed the train and the Kroschel car about half a mile before the accident occurred. The Kroschel car was proceeding at approximately the same rate of speed as the train. The testimony of the fireman who was on the engine at the time of the accident is that the train was traveling at about 45 miles per hour. When within a very short distance of the approaching car defendant said there was a sudden gust of steam shot out from the engine and across the pavement, momentarily obscuring everything ahead of him. He removed his foot from the accelerator believing that there was no imminent danger. That obscuration disappeared in a moment, and he then observed that the black line was to the left of his car, something like two feet. Then another gust of steam was shot from the locomotive across the pavement, at which time he

reached for the foot brake. The Kroschel car then appeared to be headed toward him (Swanson) diagonally. The crash immediately followed. Perhaps his own language best describes the situation:

A. "As we came I should judge from 75 to 100 feet [from the Kroschel car] a blast of steam was shot out across the highway from this train. Then I couldn't see the Kroschel car at all. It seems as though there was two gusts of steam. As I got into the first gust I see I was blinded. There was just a little letup in that steam and I looked for the black line, I saw it, and as I was watching it a second gust came. The crash was immediately. I don't remember anything else.

Q. "Were you conscious of deviating to the right or left at any time?

A. "No, I was not.

Q. "What, if anything, did you do in the operation of the car?

A. "The minute I saw I was blinded when I got into this gust of steam as I looked for the black line I took my foot off the foot feed and reached for my brake.

Q. "In the meantime the collision took place?

A. "Yes, it occurred so shortly after that I don't know if I got my brake applied or not.

Q. "About how fast were you going, as you recall, just when you were about that 75 or 100 feet distant from the Kroschel car?

A. "I should judge about 40 miles an hour."

Defendant's brother testified to substantially the same facts. Being seated to defendant's right, it is probable that he could not see the black line dividing the two lanes of traffic. It should be mentioned here that defendant, his wife next to him, and his brother Elmer, all occupied the front seat. Mrs. Swanson did not testify.

Some time after this accident occurred the Swansons brought suit against the railway company upon the theory that they had suffered injuries because of its negligence in suddenly discharging steam across this much traveled highway. They were unsuccessful in their respective suits. Later Elmer, knowing that his brother, the defendant, carried insurance, brought his suit. That is the Swanson case to which we have hereinbefore made reference.

The testimony in these prior cases *pro* and *con* seems to have been thoroughly gone over by counsel. That there are discrepancies and inconsistencies is not surprising. Swanson's story of the manner of the happening of the accident has been reasonably consistent throughout, at least the proof available here so indicates.

But there is evidence which perhaps would make a jury issue as to defendant's crowding slightly beyond the center line. That evidence appears from the testimony of one Kaehler, who claims he could trace the path of defendant's car because there was moisture upon the pavement. Taken as a whole, Kaehler's testimony is, to put the matter mildly, very unreliable. No other witness made any such claim. All others testifying on that subject say that the pavement was dry. But there is other testimony that there were scratches and gouges in the pavement supposedly made by defendant's car and that these were immediately to the left of the black stripe. These of course were made after the impact. As to whether these were made by defendant's car or by that of Kroschel seems unimportant. That kind of proof might go to show relative rates of speed of the two cars. Otherwise it is not of much consequence.

The court amongst other things charged the jury:

"In that connection, ladies and gentlemen of the jury, you are instructed that while the law requires the driver of an automobile to keep to the right when meeting another vehicle, the driver cannot be held guilty of negligence in unconsciously failing to do so if that is impossible by reason of circumstances over which he has no control and for which he is in no sense responsible."

The quoted instruction was such that it should have prevented the jury from finding against defendant unless they were convinced that he voluntarily drove to the left of the center line. The testimony, however, does not permit of any such conclusion. While the evidence to sustain any verdict for plaintiff, upon the present record, is very unsatisfactory, we do not believe it can be said as a matter of law that a jury question may not be involved.

■ Are the damages so large as to indicate passion and prejudice on the part of the jury? Considering first the father's case: We

have here a man rapidly approaching the zero hour of a long and industrious life. He had accumulated a comfortable fortune for a man in his vocation. He had established his children in such fashion that they were all financially well situated to face life's tasks without fear. He had made ample provision in his will for his lifetime helpmate and for the remaining son still living with the parents, reference being to the son Emil. He was the only son who, because of his physical limitations, might be considered a dependent. He was an invalid. For him, too, the father had made ample provision in his will. The father had retired from his active work as a farmer and limited his efforts to supervision of his various property holdings and to visiting with the two sons and daughter, to whom we have heretofore made many references. He was enjoying in a fine way the eventide of a long, useful, and industrious life.

Under the circumstances mentioned, what in dollars and cents could a trier of fact determine was the proper compensation that should go to these surviving sons and daughter? The law does not permit anything more than compensation for that which has been taken away. There are many cases bearing upon this subject, and the law as applied in this state seems well and soundly established.

In Luther v. Dornack, 179 Minn. 528, 530, 229 N. W. 784, the court said:

"The assignment of error remaining for consideration challenges the admission of evidence that plaintiff, father of the deceased, was a mechanic, had no property outside of $250 or $300 of garage equipment and the family household goods, and that plaintiff's wife, mother of the deceased, had no 'net worth.' The father was 41 years old and the mother 35 at the time of their daughter's death. As far as appears both were in good health and self-supporting. The issue was as to the pecuniary loss suffered by the parents. In such cases the absence of dependency or any reasonable possibility of it is material for the defense. For the other side equally material must be the fact of dependency or its reasonable possibility. In this case the evidence was intended to show only that the parents possessed so little of this world's goods that there was a reasonable possibility of their becoming dependent later. In determining the

damages resulting from the death of an eight-year old child there is nothing of the actual upon which to base judgment. Resort must necessarily be had to probabilities and even to possibilities which are reasonable. The field of inquiry is therefore beset with difficulty and extended in scope.

"We do not find that this court has ever passed upon the question generally of the admissibility of evidence of the kind in question. The weight of authority favors its admission. 17 C. J. 1362. See also annotation, L. R. A. 1918E, 284, where the cases are reviewed. The question is what are the present and actual damages and not what future loss may result. But even so, the future must be looked to in order to determine what the present loss is.

" 'A rich parent whose child is a continued financial expense to him and who has no reason to expect financial aid from such child sustains little, if any, pecuniary injury from its death beyond the funeral expenses; while a poor parent   *   *   *   might reasonably expect substantial aid from his child, not only during its minority, but for years thereafter.' Cincinnati St. Ry. Co. v. Altemeier, 60 Ohio St. 10, 16, 53 N. E. 300, 301."

The opinion cites and discusses numerous cases bearing upon this phase of the present controversy. Our case is just the reverse of what was considered in the one cited. Here the next of kin are financially independent. The deceased was no longer engaged in any gainful occupation. He had retired from the active life in which he was formerly engaged. He was no longer contributing to the support or maintenance of those now seeking damages. He was living with his wife and the invalid son Emil. They constituted his immediate family. Obviously his first duty was to them. If they had survived him we can readily see why a substantial verdict might be properly sustained. But it is indeed difficult, in view of the immediate death of the wife and the invalid son, to see that the remaining sons and daughter have suffered any real or substantial damage. There is here no proof that the father was in the habit of contributing to the support or maintenance of any of them.

In Kieffer v. Sherwood, 184 Minn. 205, 238 N. W. 331, the mother, having an expectancy of ten years, was killed. The next of kin were

her husband and a minor son only 18 years of age. There a verdict of $3,000 was held not excessive. But in that case one-third thereof represented medical, hospital, and funeral expenses. It seems clear that there is a very decided distinction between the dependency and consequent loss to the surviving spouse and minor child in that case as compared to the present next of kin.

In Zenner v. G. N. Ry. Co. 135 Minn. 37, 42, 159 N. W. 1087, 1089, a verdict of $4,585 was sustained. There decedent was 61 years old. He left six children, of whom four were married, a son, unmarried, of the age of 20 years, and a daughter living in the home of the age of 13 years. The court said: "This daughter suffered the greatest pecuniary loss, the loss to the son of 20 might appeal to the jury as substantial, and the loss to children not presently dependent, while it could not possibly be large, might still be found to be more than nominal."

And in Healy v. Hoy, 115 Minn. 321, 132 N. W. 208, a 17-year old son, then attending an academy preparatory to taking a medical course at the university, was awarded $3,600 general damages for the death of his father. That boy was obviously a dependent.

"Where the next of kin are so related to the decedent as to be entitled to his services or to support from him the law presumes some loss, but where the beneficiaries are not so related no substantial recovery can be had without proof of such facts as render it probable that actual and substantial pecuniary benefit would have accrued to them from his continued life." 2 Dunnell, Minn. Dig. (2 ed.) § 2618, and cases cited under note 40.

It is not deemed necessary to go further into our cases. The next of kin were entitled to recover some reasonable amount in excess of mere nominal damages, but we think $5,000 is so clearly out of reason as to be excessive.

Taking up next the mother's case: The trial court cut the verdict squarely in two. That furnishes convincing proof that the trial judge was of opinion that the verdict was legally wrong because excessive. What was in the minds of the jurors in reaching these large verdicts under the facts here appearing is perhaps explainable

in view of what we shall next consider, defendant's claim that counsel for plaintiff was guilty of misconduct in making the closing argument.

■ Counsel for plaintiff in his closing argument said, amongst other things, speaking of recoverable damages:

"August Kroschel, what kind of a father was he? Was he a stingy, penurious father, or was he a generous father, one that you could expect would help out his children? When his daughter married he gave her $500, later he gave her $4,000. He gave his son Albert a nice, beautiful 160-acre farm for $6,000, worth at least $12,000, an outright present of $6,000. He gave his son Martin something over 200 acres of land for $8,000, I believe worth, as Martin says, $100 an acre. * * * This man's life is the best argument I have seen for a long, long time as to what thrift will do. Here is a father who had provided for two of his sons in a substantial way, and, yet, besides the amounts of money and land he had given his children he had other lands; when he died he had real estate worth $26,000; he had personal property, notes and certificates of deposit of $46,000, a total estate, according to the inventory, of $72,000; $46,000 in cash, besides farm lands. * * *

"Do you suppose that August Kroschel, when he saw the end of life coming, and when he saw his wife was well provided for, that the income which the notes and certificates were producing was more than sufficient for her needs, would not have gone to his son Albert, and would not have gone to his son Martin, and said: 'Here, boys, here is your contract on which you still owe me $2,500; here, take it. Your mother and I still have all we need to take care of us.' * * * It would be a funny law that would say that because a man was fairly well to do, because he was rich, you could kill him with immunity, whereas if a man has no property but was earning wages, as Mr. Schmitt says, and you killed such a man, that you would have to pay big damages. * * * The father was killed instantly. They will now have to pay that balance on that contract. If the father had lived, in all probability—and that is what we are dealing with—the father would have said to these

boys, 'Take this $2,500 and then you have got what I wanted you to have.' Three times $2,500 is $7,500."

And further, in regard to both decedents:

"Don't you suppose they would rather have their mother and their father back than all the money that this or any other jury could give them? * * * I want to talk to you as one of you, as if I were there, as juror No. 13."

And with regard to insurance:

"Waldo admits—I say admits—we will say as much as admits he was to blame. He is served with papers in this lawsuit. He doesn't even take them to his attorney. He doesn't even know what is in the answer that is put in in this case, *he leaves it all to his insurance company. If Waldo had been a man of means, a man without insurance, I think he would have been the first one to have said to the Kroschels, 'I am to blame, I want to do what is right, I have killed your mother and your father and your brother, I want to settle this case and not take it to court.' But he is not the master of the situation. He gives, as the evidence shows, this complaint to somebody here in Mankato representing the insurance company, and they give it to Mr. Schmitt. That is the last that Waldo Swanson has got to do with this action until he is called here as a witness in this case.*"

And there are many other references to "insurance," "insurance companies," "clever insurance adjusters," and other similar remarks. To all of these remarks defendant duly excepted and appropriately assigned error thereon in the court below and has urged the same here.

The case at best is close to the border line. As such, as this and other courts have frequently said, improper remarks of counsel may and often do lead to prejudicial and unjust results.

The question of liability in every case depends upon proof. A negligence case is no exception. The facts establishing negligence must be shown. The existence of insurance is wholly irrelevant to the determination of that vital question. If it be proper to argue

upon such basis as was here employed it would seem equally clear that many a defendant might argue that plaintiff, after all, has split his recovery with the attorney prosecuting his case upon a contingent fee basis; or that the attorney obtained his employment as an ambulance chaser; that the whole affair is smeared with champerty. Clearly such argument would be improper, and no court would permit counsel so to proceed. But one argument is as bad as the other because each would be likely to lead the triers of fact away from the real issue and into the quagmire of passion and prejudice.

In the proper performance of the very solemn duty of jury service the public has a direct and important interest. If human rights (and of property as well) are made to depend upon prejudice, bias, or other improper factors, the jury as the judges of fact issues, instead of being that highly important arm of the court designed to ascertain and determine the truth and so to bring about justice, becomes rather an unwitting instrumentality for defeating the very purpose of its existence.

There is a manifest duty resting upon both lawyers and courts to prevent improper influences from seeping into litigated issues. Anything so foreign to these issues as here appears reflects upon both lawyers and courts and lends aid to the not uncommon belief that law after all is a game of chance rather than an impartial and dignified hearing and determination of conflicting claims. If the jury system is to continue in its historic virility courts must summarily deal with infractions of the type here employed. What we recently said in Ferraro v. Taylor, 197 Minn. 5, 11, 265 N. W. 829, 832-833, fits into the present situation:

"Courts are here to administer justice, not to award verdicts according to prejudice, and it is the duty of the trial court to see that lawyers do not arouse the passions or the prejudices of jurors. * * * Courts and counsel must understand that as long as conduct of this character is permitted and indulged in cases will have to be tried over again until they are fairly submitted."

The purpose in permitting inquiry of prospective jurors as to their interest in any corporate enterprise is to ascertain every

juror's fitness to sit in judgment on fact issues so that an impartial trial may be had upon the merits of the controversy. If it appears to the court that the inquiry goes beyond that legitimate field it should promptly stop counsel. The method suggested by the Michigan court in Holman v. Cole, 242 Mich. 402, 406-407, 218 N. W. 795, 797, impresses us as being sound and workable:

"In the case before us, the inquiry referred to a foreign corporation. We feel forced to the conclusion that the purpose of counsel in asking each one of the jurors called if he was interested as a stockholder in such company was not for the purpose of obtaining information, but to impress upon their minds that the defendant was protected by insurance and would not be personally liable for any judgment entered in the case. If information alone was sought, it might easily have been obtained by asking the jury collectively if any of them were stockholders in any corporation, and, if they were, to have asked the kind of a corporation they were interested in."

A recent and well considered case going fully into this matter, and where many cases are commented upon and cited, is Fielding v. Publix Cars, Inc. 130 Neb. 576, 265 N. W. 726.

That the poison injected into this case by counsel for plaintiff bore abundant fruit is apparent. In substance and effect the jury were told that defendant conceded liability but that purely through the wickedness of his insurer those injured were prevented from recovering what defendant himself would gladly pay if he had the means.

The record justifies no such argument. Defendant has maintained throughout his exercise of due care. And it is unthinkable that he would consciously risk the life of his wife, his brother, and himself.

■ Another claim of error urged by defendant is that funeral, hospital, and medical expenses are not recoverable inasmuch as the father and mother left ample estates to take care of these items; that as such no loss occurred to the next of kin. We cannot agree to this claim.

By 2 Mason Minn. St. 1927, § 9657, it is provided that the damages therein provided for cannot exceed the sum therein limited and

that recovery "shall be for the exclusive benefit of the surviving spouse and next of kin  *  *  *; but funeral expenses, and any demand for the support of the decedent, duly allowed by the probate court, shall first be deducted and paid."

In G. S. 1866, c. 77, no reference to funeral expenses is made. Subsequent amendments do not seem to have changed the original provision until the adoption of L. 1891, c. 123, wherein it was provided "that any demand for the support of the deceased, and funeral expenses, duly allowed by the probate court, shall be first deducted and paid." In substance and effect that is the rule to this day.

This court in Sykora v. Case T. M. Co. 59 Minn. 130, 133, 60 N. W. 1008, 1009, in considering the effect of the amendment quoted, said:

"This amendment is very peculiarly and awkwardly worded. But it is apparent that now the widow and next of kin may not be the exclusive beneficiaries of the amount recovered. Those persons (if any) who have demands for the support of the deceased, and his funeral expenses, are preferred beneficiaries, to the .extent of their claims. Hence, the statute, as amended, must be construed as if it read: 'The amount recovered is to be for the exclusive benefit—First, of those who have demands for the support of the deceased, and his funeral expenses; and, second, of the widow and next of kin.' "

And we think the general rule, in this country at least, is to the effect that such items are recoverable. Thus in 17 C. J. p. 1340 [§ 216] (b), it is said:

"An action may be maintained by an administrator for the benefit of the estate to recover for the medical and funeral expenses incurred by or on behalf of deceased after receiving the injury which caused his death, and, under some statutes, this action is not barred by an action by the administrator for the benefit of the widow and next of kin. However, in order to sustain the action, it must be shown that the estate was liable for these expenses."

We are satisfied that justice requires that a new trial should be had in each case, and it is so ordered.