[Civ. No. 15175. Second Dist., Div. Three. Feb. 11, 1947.]

ALICE A. LᴇBLANC et al., Appellants, v. ROBERT A. BROWNE et al., Respondents.

Charles A. Thomasset for Appellants.

Spray, Davis & Gould for Respondents.

DESMOND, P. J.—Plaintiffs, Alice A. LeBlanc and Harry LeBlanc, also known as Alice A. White and Harry White and so referred to at the trial and in this opinion, appeal from a judgment entered subsequent to the rendition of a jury verdict in favor of defendant in an action by which plaintiffs sought damages for personal injuries sustained by plaintiff Alice A. White on March 2, 1942, when a Mercury automobile, driven by defendant, collided with her in a pedestrian crosswalk located on South Vermont Avenue just immediately south of West Thirty-Fifth Street in the city of Los Angeles. Defendant, as a defense to plaintiffs' action, set up contributory negligence on the part of Mrs. White as the proximate cause of her injuries, alleging that ''said plaintiff, immediately prior to and at the time of this accident was walking across Vermont Avenue proceeding in a southeasterly direction at the southeast corner of Vermont Avenue and 35th Street, and was doing so in a reckless, negligent and careless manner and without regard for other traffic upon 35th Street and Vermont Avenue, and without due regard, or any regard or care for her own safety and the safety of others.''

South Vermont Avenue extends in a northerly-southerly direction and is approximately eighty feet wide from curb to curb. On it are located four streetcar rails, two for north-bound and two for south-bound streetcars. West Thirty-Fifth Street approaches South Vermont Avenue at a slight angle from the southeast but does not cross it, terminating on the easterly boundary of South Vermont Avenue. It is approximately thirty-four feet wide from curb to curb. Several feet south of the corner formed by Thirty-Fifth Street is located a pedestrian crosswalk, fifteen feet wide, running across South Vermont Avenue and marked by two white lines parallel to each other. Twelve inches north of the northerly line of the pedestrian crosswalk and approximately eighteen inches to the east of the most easterly streetcar track is painted a white ''button'' and nine feet directly north of this ''button'' is

another white painted "button." These so-called "buttons," which we have placed in quotation marks, are merely discs painted on the pavement and are to be distinguished from two metal buttons which appear in photographic exhibits at a considerable distance north of the crosswalk and which rise several inches above the level surface of the pavement. These metal buttons are of no importance in this case being located in the passenger loading zone north of the crosswalk where the accident occurred. Both corners formed by Thirty-Fifth Street at its junction with Vermont Avenue are improved with buildings and the immediate vicinity is a business one.

The accident occurred at approximately 5:30 p. m. and in daylight. Mr. Browne had been driving his automobile in a westerly direction on Thirty-Fifth Street and was completing a left-hand turn onto Vermont Avenue when he collided with Mrs. White, the only person at that time in the pedestrian lane.

Testimony as to the actual impact was given by Mrs. White, Mr. Browne and Mrs. Nellie B. Feltman, a disinterested witness.

Browne, questioned under section 2055, Code of Civil Procedure, stated there was no traffic "in the immediate vicinity" when he made the turn after he had made a boulevard stop at Vermont Avenue and north of the center line of Thirty-Fifth Street; that no cars were ahead of him; that he then proceeded to make a "rather sharp" left-hand turn, demonstrating on the diagram then before the jury and the trial court how he made the curve with respect to the painted "buttons," heretofore described, saying "I think that the right part of my car . . . went over one of those buttons here." With respect to the position of the "buttons" on the highway, Browne stated that although he was not sure he was "under the impression that they were in the center of the street, right between the two car tracks." Counsel for plaintiffs then stated he would stipulate that the location of the "buttons" could be changed as the testimony was "brought into evidence, if there is any occasion for a change. My position at this time is there will be no change in the location of the buttons." Parenthetically, it may be stated here that the position of the painted "buttons" was not changed by any other evidence; in fact, an examination of defendant's Exhibit C, a photograph taken during the trial and looking south on Vermont Avenue at the intersection of Thirty-Fifth Street,

furnishes proof that the "buttons" were located at the points
heretofore mentioned. Concerning them the following col-
loquy took place: "Q. BY MR. THOMASSET: Now, with refer-
ence to the buttons as you have placed them, what was your
line of travel? A. [BY MR. BROWNE] Well, as I remember,
there was part of the car, I believe, went over the buttons,
one of these buttons, about like this. Now, I was more towards
the center of the street than I would be here. In other words,
I would have to go at almost a right angle if I went around
those buttons this way, which I think would be rather im-
practicable. Q. I think it would be impracticable, too. THE
COURT: That will go out and the jury will disregard it.
Q. BY MR. THOMASSET: It is exactly what you did. Then it
is your testimony at this time that the button which you have
placed and indicated with a B-4 was a button which you
straddled as you proceeded to the south, is that it? Is that your
testimony? A. That is right." When questioned as to Mrs.
White's position when he collided with her, the witness stated
that she had not reached the center of the street but was "very
close to it," indicating on the diagram the position of Mrs.
White as being "between the two westernmost rails on Ver-
mont"; that she "had passed the second rail," the rails hav-
ing been numbered by counsel as 1, 2, 3, and 4, from west
to east. The questioning then continued: "Q. . . . Isn't it a
fact—assuming now for the time being, which I am not con-
ceding, this is the location of the button, is it not a fact that
all of your car was to the east of that button at the time of
the collision, with the possible exception of your right front
wheel? A. Yes, it is possible. . . . Q. How far was she [Mrs.
White] from the point of collision when you saw her the first
time? A. Well, just a few feet, I would say about six or
seven or eight. Q. Well, she only took one or two steps after
you first saw her, didn't she? A. That is about all she could
take, yes. . . . Q. After you first saw her up until the time of
the collision? A. That is right." He testified that when he
first saw her, he applied the brakes and skidded "some 6 or
7 feet." It appears from the record that police officers ar-
rived subsequent to the accident and took measurements.
Plaintiffs' counsel questioned the witness: "Q. And isn't it
a fact that when Officer D. E. Leffler and Officer R. W. Laurit-
zen got there your right front wheel was . . . 29 feet west of the
east curb of Vermont. . . . A. I didn't measure it; I don't

know. Q. I mean the right front wheel was only 29 feet. They measured it in your presence, didn't they? A. I don't know they did, no; they might have. Q. You didn't see them make measurements there, did you? A. I didn't notice them, no. Q. Would you say that was wrong, if they did measure and found that your right front wheel, this being that one, was just 29 feet west of the east curb. . . . And isn't it a fact that your right wheel was just——right rear wheel was just 26 feet west of the east curb? A. It might have been.'' The witness then stated that when the officers arrived his car was ''still in the skid marks'' and that he thought the ''right front part'' of his car was still in the crosswalk; that it took him ''only a few seconds . . . more like three or four'' from the time he left the corner until he struck Mrs. White; that he traveled ''about 40 feet, approximately'' from the time he left the corner until he struck Mrs. White. He was confronted by questions and answers made in his deposition as follows: ''Q.—Now, at the time of the collision how fast were you going? A.—Well, it is hard to say. I just started up and hadn't gone more than, I would say, about 20 feet. . . . Q.—And how long would you say that it took you to go from the place where you were stopped waiting to make your turn left on Vermont to the point of impact? A.—Only about 15 feet. . . . Q.—How long after you stopped until you started was it that you had this impact? A. It wasn't very long. Just about one or two seconds, I would say.'' Examined by his own counsel, Browne stated that he applied his brakes as soon as he saw plaintiff; that he didn't remember whether he turned his car ''any further to the left or not,'' but that it was being turned to the left at the time; that after colliding with Mrs. White his car traveled ''about three or four feet'' before it came to a stop; that the ''right front part of the car'' came in contact with Mrs. White.

Plaintiff Alice White testified as follows: That at the time of the accident she was 46 years of age and weighed 235 pounds; that she is five feet three inches tall; that she was wearing glasses at the time; that she had been at the intersection of Thirty-Fifth Street and Vermont ''quite frequently''; that at the time of the accident she was in the pedestrian crosswalk on Vermont Avenue traveling from west to east; that before she started to cross the street she looked for cars and there were none coming; that at the time of the collision she was in the ''center of the crosswalk'' between

"the third and fourth rails" but "closer to the fourth rail," as numbered by counsel from west to east; that she continued to look to the left until she "got about to the center"; that when she got to about the center she then looked to her right [south] for cars; that she did not see the car that hit her; that she was struck on her left side; that after the impact she lay at an angle with her head "on the third rail" and her feet extended northerly; that she was thrown out of the cross-walk "about 12 feet" south; that the first one to get to her after the collision was Browne, who stated "he was very sorry it happened and that he had made a very short cut"; that later a Mrs. Feltman and a number of police officers came to her; that she was unable to get up or walk and left "by ambulance and stretcher." On cross-examination Mrs. White stated that while she did not see the automobile at the time it collided with her she saw it while lying on the pavement, saying "I don't know whether it was on the west side or east side, but I know I could see the car in front of me. . . . When I was struck, as I say, I was right in there between the two tracks with my head on the third rail lying at an angle." The witness was then asked "Now, as you walked across the street there, Mrs. White, did you see any cars that stopped over here on the east side of Vermont? . . . A. No, I did not. Q. Did you look for any? A. I didn't have any occasion to look over there, I was taking care of——I took care of my left, then I was taking care of my right; I had no indication [occasion?] to look to see what was coming down on 36th [35th] Street because that street doesn't cut through there. Q. . . . So from the time you started across from the left, you at no time looked over on 35th Place to see if there were any cars coming out there? A. Well, there was no traffic in sight; I didn't see any traffic in sight. Q. Well, you say you had no occasion to look. What I want to know is whether you did look over there? A. I don't recall that I did. . . . I started to look at my right when I got to the center of the track, I looked to my right. . . ." Questioning by defendant's counsel then continued: "Mrs. White, my question was that you only took one or two steps from the time that you got to the center of the street until the time the accident took place? A. Well, all I know is that I didn't see the car. Q. Well, I appreciate that, Mrs. White, but what I want to know is if it is not a fair statement that you only

took one or two steps from the time you got to the center of Vermont until the accident took place. A. Well, I——what I usually do when I cross the car tracks, I always walk on the track—— Q. No, I don't want to know what you usually do, I want to know what you did on this occasion. A. I was watching the track to see I didn't get my heel caught in the rail. Q. Then you were looking down? A. After I got through taking care of my left, yes, I was watching the car rail to see I didn't get my heel caught in the track. Q. I see. Then from the time you got to this first rail you started looking down at the car tracks to see you didn't get your heel caught in it? A. Yes, I was looking at the rail to see I didn't get my heel caught, then I looked up to see to my right. Q. You were looking at that when the accident occurred? A. It might have been possible that I was looking at the—— Q. At the rail? A. Yes.'' On redirect examination Mrs. White testified that she knew that her head lay on the third streetcar rail after the impact because an officer told her he would have to move her head ''and let traffic have the rail, and told me not to be alarmed''; that she saw the streetcars go by on her right, headed north; ''Q. And speaking from yourself now, not from the standpoint of east or west or north or south, but from your own self, as you were lying in the street, was that car [defendant's] as you were looking at it to your right or to your left? A. Well, I could see the front of it. I don't know whether or not it was directly to my right, I could see it this way——it would be my right, yes. Q. You could see it this way, is that right? A. That is right, yes. Q. That was to your right? A. To my right.''

The testimony of the only other witness to the accident, Mrs. Nellie B. Feltman, who was seriously ill and confined in a hospital at the time of the trial, was given by way of deposition. She testified as follows: That she did not know Mrs. White prior to the accident; that she saw her at the time she was hit; that she (Mrs. Feltman) was on the west side of Vermont ''straight in front of the pedestrian walk that Mrs. White was in''; that she didn't see Mrs. White when she started to cross Vermont but saw her walking in the pedestrian crosswalk, ''she had her back to me''; that Mrs. White was always in the pedestrian crosswalk; that Mrs. White was the only one in the pedestrian crosswalk; that at the time she was hit she had reached the third rail and was ''right in the center'' of the pedestrian crosswalk; that after striking Mrs.

White the car went about 10 to 12 feet before it stopped; that the car was going about 15 miles per hour; that Browne "wasn't going fast. He had just made . . . a left-hand turn." On cross-examination this witness was asked, "And did you actually see this accident at the time it happened? A. At the time it happened; the minute it happened. I was the first one to go over to her, and I picked up her packages and held them until the officer came. Absolutely the woman was right out in the middle of the pedestrian crosswalk. Q. Were you on the same side of Vermont that Mrs. White started to cross from? A. Yes, I was. There is a bakery there. Q. And you were not crossing the street in any direction? A. No, I just stood still. I was looking for the car, and there was nobody in the zone but her. Q. Do the signals go? A. No, just the stop signals. Q. Were there any stop and go signals for traffic going the same way Mrs. White was? A. Yes. Well, you know, it's just a stop and then start, and if traffic is all right it could go; this car. Q. Did you say that there are red and green lights there at that point? A. No. Q. There are not? A. I don't think so. No, just white lines. Q. There is a boulevard stop? A. Yes, on 35th Street. He was making that turn south. Q. How was the condition of traffic that day? A. The traffic wasn't congested at all. It was about five o'clock. . . . Q. Were there a lot of cars in the street there? A. No. Q. How many cars were there going the same way that the lady was crossing the street? A. There wasn't any. Q. How many going the other way, the way the car involved in the accident was going? A. Everything was just clear. Clearer than this hospital."

Appellants predicate their appeal upon two major contentions—(1) that defendant's negligence was the proximate cause of the accident, and (2) that the verdict is unsupported by the evidence, there being no substantial evidence of contributory negligence on the part of plaintiff.

It is a settled principle that contributory negligence is ordinarily a question of fact for the jury to determine and that the implied finding of the jury upon that issue will not be disturbed upon appeal if there is any substantial evidence or reasonable inferences to support it. In this connection respondent argues that the "factual situation presented at the trial of this case manifested ample testimony to support a finding that the appellant did not exercise ordinary care for her own safety at the time of the happening of the accident."

The question for our consideration, therefore, is whether the jury's implied finding of contributory negligence on the part of plaintiff has any evidentiary support.

As we review the record before us, it is clear that defendant was guilty of negligence, for the violation of a statute prescribing traffic rules is prima facie evidence of negligence as a matter of law (19 Cal.Jur. 632, § 65; 13 Cal.L.Rev. 428; *Samuelson* v. *Siefer*, 62 Cal.App.2d 320, 324 [144 P.2d 879]; *Harris* v. *Johnson* (1916), 174 Cal. 55 [161 P. 1155, Ann.Cas. 1918E 560, L.R.A. 1917C 477]). This principle, however, is subject to the limitation that recovery may be had only if the violation is the proximate cause of the injury (19 Cal. Jur. 636). The testimony is uncontradicted by any credible evidence that Mrs. White was struck in a marked pedestrian crosswalk between the third and fourth streetcar tracks on the easterly half of Vermont by defendant who admittedly made a "sharp" turn and "cut" the "button," thereby violating section 540(b) of the Vehicle Code, and who was driving his car on the wrong side of the street in violation of section 525, Vehicle Code. He also failed to yield the right of way to a pedestrian in a marked crosswalk as required by section 560(a) of the Vehicle Code. Defendant's testimony that Mrs. White had not quite reached the center of Vermont but was "very close to it" when he struck her is so highly improbable and unworthy of belief as to form no basis for a conclusion by the jury that the point of impact was elsewhere than claimed by appellants, namely, in the easterly half of Vermont Avenue. We cannot overlook the defendant's testimony to the effect that he "cut" the "buttons," namely the white discs which were not located at the center of the intersection but were definitely on the east side of Vermont Avenue approximately eighteen inches east of the most easterly streetcar track. In addition, we have in mind also the physical facts surrounding the accident, including Mrs. White's position and the position of the defendant's car after the impact and also including defendant's own photographic Exhibit C, which conclusively established that the painted "buttons" were as heretofore described and entirely on the easterly half of Vermont Avenue. A conflict is not created where the undisputed facts render the testimony inherently improbable.

Mrs. White was bound to exercise ordinary care and prudence for her own safety, but that imposed upon her no duty, once she had reached the easterly portion of Vermont,

to anticipate the approach of an automobile coming from her left in a path which, by ignoring the center of the intersection, cut that point by so wide a space as to strike her down. She had the right to assume that a driver of an automobile intending to proceed in a southerly direction on Vermont Avenue would not use the easterly side of the street. Vehicles are required under the law to travel on the right-hand side of the street (Veh. Code, § 525). As a careful and prudent person she was under no obligation, in the absence of a situation which might warn her of impending danger, to look to her left after she had passed into the easterly portion of Vermont, or, to put it in other words, to anticipate an automobile approaching on the wrong side of the street (*Harris* v. *Johnson, supra,* 174 Cal. 55, 58-59; *Hyams* v. *Simoncelli* (1940), 41 Cal.App.2d 126, 132 [106 P.2d 68]; *Wright* v. *Foreman* (1927), 86 Cal.App. 595, 602 [261 P. 481]; *Lewis* v. *Tanner* (1920), 49 Cal.App. 271, 273 [193 P. 287]); any requirement to exercise such extraordinary precaution would place an intolerable burden and hardship on a pedestrian. *Harris* v. *Johnson, supra,* presents a street crossing case that has points in common with the case at bar. The evidence was without conflict and showed that defendant, while driving his automobile in a westerly direction, passed on the left-hand side of the street a standing streetcar injuring plaintiff who, having alighted from another streetcar and having passed in front of the stationary streetcar, was proceeding to cross the street in a southerly direction. The Supreme Court in that case said (p. 58) : " 'The general rule is that every person has a right to presume that every other person will perform his duty and obey the law, and in the absence of reasonable ground to think otherwise it is not negligence to assume that he is not exposed to danger which comes to him only from violation of law or duty by such other person.' (29 Cyc. 516; *Medlin* v. *Spazier,* 23 Cal.App. 242 [137 P. 1078].) Such person must, of course, himself use reasonable care to observe the conduct of the other person so far as such conduct may affect his own safety at the time. The plaintiff had the right to assume that the defendant's automobile, or any other vehicle coming westerly on Seventh Street, would confine its travel to the right-hand side of the street, as provided in the ordinance aforesaid, unless and until, in the reasonably careful use of her faculties, she had reasonable cause to believe otherwise. There was evidence to show that before attempting to cross the

street she looked in both directions, and used ordinary care to ascertain whether or not any vehicle was approaching, and that she did not see the defendant's automobile coming, notwithstanding such caution. . . . The evidence was sufficient to exonerate her from the charge of contributory negligence." (See, also, *Averdieck* v. *Barris* (1923), 63 Cal.App. 495, 497 [218 P. 786].) ▉ In the instant case there is nothing in the record to indicate any situation which might have warned Mrs. White of danger. There was no traffic in the immediate vicinity; it was daylight; Mrs. White was the only pedestrian in the crosswalk at the time; there is no evidence that Browne gave any warning to call attention to the fact that he was making a left-hand turn and "cutting" the button nor is it claimed by him that any such warning was given. His own testimony indicates that he did not see Mrs. White until she was a few feet in front of him and if he had been as alert as he should have been he could have seen that Mrs. White was unaware of his approach or of any impending danger. Imprudence and want of care, therefore, cannot be predicated upon the fact that Mrs. White did not assume that there would be a violation of law on the part of defendant or any other driver of a vehicle. While it is true that Mrs. White testified that at the time of the accident it "might have been possible" that she was looking down at the streetcar tracks to prevent her heel from being caught nevertheless she also stated that *"after I got through taking care of my left . . . I was watching the car rail to see I didn't get my heel caught . . . then I looked up to see to my right."* (Italics ours.) There is no evidence upon which a legitimate inference could be based that if Mrs. White had looked toward Thirty-Fifth Street she would have seen defendant and his automobile. The record is silent as to where Mrs. White was at the time defendant made his boulevard stop on Thirty-Fifth Street and, as heretofore stated, defendant saw Mrs. White for the *first* time when she was only "five or six feet—seven or eight probably" away from him. ▉ The law does not require of a pedestrian that he must look in every direction during every instant of his progress. It does require, however, that he must look at least in those directions from which danger may be reasonably apprehended, as often and as carefully as would a person of ordinary prudence under like circumstances. (*Gett* v. *Pacific G. & E. Co.* (1923), 192 Cal. 621, 627-628 [221 P. 376].) For the jury to base an inference of contribu-

tory negligence on the fact that Mrs. White failed to look toward Thirty-Fifth Street, without any showing that the situation was such as to put her on her guard, would be to base an inference on mere conjecture or speculation.

 We believe that under the circumstances of this case the evidence and the reasonable inferences to be drawn therefrom are insufficient to sustain the jury's implied finding that Mrs. White was contributively negligent.

The circumstances of the accident, as developed by the evidence, distinguish this case from all the cases relied upon by defendant in support of the familiar rule that the question of contributory negligence is usually one of fact. The unusual facts of the present case take it out of the general rule and render the question one of law.

 A further contention urged by appellants for reversal is that prejudicial error occurred when Mrs. White was questioned by respondent's attorney concerning an $18,000 damage action filed by her in 1935 or 1936 against a certain doctor for injuries to her right eye and the fact that she had been paid $2,250 "for settlement of the case." It appears from the record that the questioning objected to by appellants followed testimony by Mrs. White to the effect that she had had no trouble with her right eye prior to this accident and that her right eye had not been injured. Subsequently she stated that the injury was to the tear duct and that she had received a permanent black eye as a result thereof. The court admitted the testimony but instructed the jury to disregard it "except in so far as it goes to the injury of this plaintiff and the condition of her eyesight," that being stated as the sole purpose for offering the evidence. We believe that the evidence was admissible for the limited purpose for which it was offered.

The judgment is reversed and the cause remanded to the superior court for a new trial on the sole question of the amount of damages sustained by the appellants.

Shinn, J., and Wood, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied April 3, 1947. Shenk, J., voted for a hearing.