**Norbert NEPPLE, Appellant,**

v.

**Kevin WEIFENBACH and Sac County, Iowa, Appellees.**

**No. 2–60584.**

Supreme Court of Iowa.

Jan. 24, 1979.

Wunschel Law Firm, P.C. by Russell S. Wunschel and James R. Van Dyke, Carroll, for appellant.

Louis, Moore & Kohorst, Harlan, for appellees.

LARSON, Justice.

Plaintiff appeals from a judgment entered in his favor for personal injuries arising out of a motor vehicle collision, raising issues as to the propriety of the court's (1) instructing the jury that plaintiff had a duty "to make use of reasonable means to effect as speedy and complete a cure . . as could be reasonably accomplished;" (2) allowing defendant's use of certain portions of a medical deposition; and (3) permitting introduction of evidence concerning amounts received in settlement for prior injuries. Because of errors committed as to the last issue, we reverse and remand for a new trial.

A detailed recitation of the facts of the collision giving rise to this claim is not required. Stated briefly, plaintiff Norbert Nepple was riding in a vehicle which collided at a stop-sign intersection with a gravel truck owned by the defendant Sac County and operated by its co-defendant Weifenbach. The collision occurred in Sac County, but trial was moved to Ida County on a change of venue. During the trial it was shown that plaintiff had suffered prior injuries, and it is that matter which sparked the heated confrontations now before us in issues (2) and (3).

I. Plaintiff complains that the trial court erred in its instruction 29, which stated in part:

If under the evidence and these instructions you find that the plaintiff, Norbert Nepple, is entitled to recover damages herein, you are instructed that it was the duty of the plaintiff, Norbert Nepple, to make use of reasonable means to effect as speedy and complete a cure of his injuries as could be reasonably accomplished under all the circumstances. If you find from the evidence that said

plaintiff failed to act as a reasonable prudent person to make use of reasonable means to effect as speedy and complete a cure of his injuries as could be reasonably accomplished under all the circumstances, he cannot recover for any injuries, suffering and disability caused or induced by such failure.

The plaintiff contends this improperly placed upon him the burden of proving mitigation of his own damages, contrary to our holding in *Shewry v. Heuer,* 255 Iowa 147, 154, 121 N.W.2d 529, 533 (1963) and the provisions of § 619.7, The Code. He did not raise this issue at trial in his objections to the instructions, however, complaining only that "[t]he record is completely devoid of any evidence that this injury could ever be cured and yet the instruction says 'cure,' and so we feel that that certainly is improper because it's obvious that a fracture can't be cured."

This objection did not raise the issue of shifting of the burden of proving mitigation and we may not, therefore, rule on this matter on appeal. Rule of Civil Procedure 196; *Rush v. Sioux City,* 240 N.W.2d 431, 441 (Iowa 1976). In order to provide guidance on retrial, however, we advise the trial court that we have serious doubts about the propriety of any instruction which places the burden of proving such mitigation upon the plaintiff. *See Shewry v. Heuer,* 255 Iowa at 154, 121 N.W.2d at 533.

II. Plaintiff also complains that the court erred in allowing defendants to use portions of a pretrial deposition of the treating doctor in their case in chief. This deposition had been taken shortly before trial, because the doctor was expected to be out of town for the trial. Because of a delay in completing the trial caused by a snow storm, the doctor actually was available in person at the time his deposition was used by defendants at trial. Plaintiff on appeal urges errors as to use of the deposition on two grounds: (a) that use of any portion of the deposition was improper, because the foundational basis for its use under Rule of Civil Procedure 144(c), i. e., absence of the witness, no longer existed;

and (b) that part of the deposition dealing with an April 1975 medical report on the plaintiff offered in defendants' own evidence was not admissible, because the trial court had previously excluded the same evidence when offered by defendants as part of their recross-examination of the doctor. This report showed continuing problems then existing as a result of a previous injury. It is undisputed that plaintiff had not touched on this report in his redirect examination of the doctor.

We need not determine whether or not the court erred in admitting this portion of the deposition to determine the disposition of this case on appeal, in view of our disposition of the third issue raised, which requires reversal. Under the stipulation of the parties any evidentiary use of the deposition would be conditioned upon the unavailability of the doctor as a witness, under rule 144(c). It is so unlikely that the same problem would be again presented to the trial court in the same context that deciding the issue for possible guidance on retrial would serve no useful purpose.

III. The last issue raised, and the one which disposes of this case on appeal, concerned the trial court's admission into evidence of certain suits, claims, settlements, and workers' compensation awards arising out of prior injuries suffered by plaintiff. In 1969 he had fallen from a ladder, causing a skull fracture. In 1973, he was involved in a motor vehicle accident resulting in an injury to his neck. The incident for which he presently seeks recovery occurred in June 1975 and caused injury to his head, shoulder, wrist and forearm.

Plaintiff testified about these prior injuries and attempted to show that his present complaints were caused by his latest accident and not by those prior. He testified that he had been able to work, with some limitations, after both of the prior incidents. No mention was made on direct examination of any prior claims by him. However, on cross-examination, the following occurred:

Q. Did you have any problems at all when you went back to work [after

the 1969 fall from a ladder] for Badding in doing your work?

A. No.

Q. You were able to do everything that they requested you to do?

A. Yes.

Q. Now, did you receive any compensation or payment for the injuries that you sustained by reason of the fall you had in 1969?

A. Yes.

[Plaintiff's attorney:] I am going to object to this as not proper cross-examination. It's irrelevant and immaterial.

The Court: Overruled.

. . . . .

A. Oh, yes, I did. I received workmen's comp.

Q. For how long a period?

A. Until in October.

Q. Now, what were the specific injuries that you were being paid for during that period of time?

A. Of '69?

Q. Yes. What injuries did you claim that caused them to pay you this money?

A. Head and neck injuries.

. . . . .

Q. Now, with regard to the accident that occurred in 1973 . . . what injuries do you claim you sustained in that accident?

A. Neck injuries.

Q. What part of your neck?

A. At the base of the skull.

. . . . .

Q. Now, in connection with that [1973 accident], did you ever receive any compensation or payment by reason of that injury?

Plaintiff's attorney: Same objection last urged . . . and it is irrelevant and immaterial, not the best evidence.

The Court: Overruled. Will you read him the last question.

. . . . .

A. Are you referring to the '73 accident?

Q. Yes, I am, sir.

A. Yes, workmen's comp.

Q. Did you receive anything other than workmen's compensation as a result of that accident?

Plaintiff's attorney: Same objection last urged.

The Court: Same ruling. You may answer.

A. No.

Q. Isn't it a fact that you retained Mr. Wunschel as your lawyer _ _ _

A. Oh _ _ _

Q. —in connection with that accident, didn't you do that?

A. Yes, I did.

Q. And didn't he obtain a settlement or a payment for you?

A. Yes, he did.

Q. Would you want to tell the jury how much you were receiving in workmen's compensation per month during that time?

A. Around $350 a month.

Q. Did you want to tell the jury how much you received in settlement at that time?

A. Well, it wasn't too large after I paid my attorney.

Q. Just tell me the amount.

Plaintiff's attorney: Now, just a minute. Let him answer. You asked the question.

The Court: Just a minute.

A. The question is the amount of settlement?

Q. Yes.

A. $10,000. After I had my attorney paid a third of the settlement, paid my workmen's comp back, and paid all my medical bills, there wasn't too much left any more.

Similar evidence was also admitted over objection in connection with plaintiff's deduction of prior medical expenses on his income tax returns, as to whether they were paid by worker's compensation, hospital insurance, or the plaintiff.

 Appellees contend that the objections to these questions were not sufficient

to preserve error, and that in any event they were properly overruled. Objections were not made as to every similar question regarding prior claims and the objections which were made were of a general nature, urging only that the answers sought were "irrelevant and immaterial." The issue here is whether the objections made were sufficient. The objection "irrelevant and immaterial" is sufficient when admissibility of the evidence is attacked on either of those grounds. *State v. Clay,* 213 N.W.2d 473, 477 (Iowa 1973). A law review article by Dean Ladd was quoted in that case, as follows:

> While the wording [incompetent, irrelevant and immaterial] may appear to be a "catch-all," it strikes basically at the materiality of offered proof and its relevancy. It is questionable whether other words could be more specific to raise these issues than those employed in the general objection. *State v. Clay,* 213 N.W.2d at 477, quoting Ladd, "Objections, Motions and Foundation Testimony," 43 Cornell L.Q. at 546.

One reason for requiring a "specific" objection is that in fairness to the trial court, it should know upon what ground the objector relies and should be given an opportunity to pass upon it. *Floy v. Hibbard,* 227 Iowa 149, 151, 287 N.W. 829, 830 (1939). In this case, the grounds urged for exclusion had been urged in a motion in limine which was argued and denied by the court before any of the questionable matters were presented to the jury. It is clear that the court and opposing counsel were aware of the grounds for complaint.

Those cases holding such evidence inadmissible have done so on grounds of relevancy. *See, e. g., Alonza v. With,* 214 Cal. App.2d 753, 760, 29 Cal.Rptr. 710, 714–5 (1963) and *Ferriola v. Burdick,* 146 Conn. 574, 577, 153 A.2d 319, 320 (1959). *See also* cases cited in Anno., "Cross-Examination—Previous Condition," 69 A.L.R.2d 593 at 600. The objection "irrelevant and immaterial" was sufficient to preserve error as to evidence of prior claims by plaintiff.

Plaintiff did not repeat this objection as to all of the later questions on the same matters. However, once a proper objection has been urged and overruled, it is not required that repeated objections be made to questions calling for the same type of evidence. *Lessenhop v. Norton,* 261 Iowa 44, 55, 153 N.W.2d 107, 113 (1967); *State v. Miller,* 204 N.W.2d 834, 841 (Iowa 1973).

While evidence of prior injuries would clearly be admissible to show the extent, if any, to which they contribute to the plaintiff's present complaints, whether he may be cross-examined on the matter of claims for payment for prior injuries is not clearly established in Iowa.

We have adhered to the "collateral source" rule, prohibiting evidence of payments by a third party for the subject injury. *See, e. g., Rigby v. Eastman,* 217 N.W.2d 604, 609 (Iowa 1974); *Clark v. Berry Seed Co.,* 225 Iowa 262, 271, 280 N.W. 505, 510 (1938). However, we have apparently never decided the issue of the admissibility of evidence of claims for prior injuries to the plaintiff.

Minnesota has permitted cross-examination on prior recoveries. *See, e. g., Kelsey v. Chicago, R.I. & Pac. Ry.,* 264 Minn. 49, 117 N.W.2d 559, 563 (1962). California has permitted it in limited situations. *See, e. g., LeBlanc v. Browne,* 78 Cal.App.2d 63, 75, 177 P.2d 347, 354 (1947). In *LeBlanc,* the court admitted evidence of a prior settlement for injury to the same eye. The jury was instructed that this could be considered only as to the connection of the injury with her previous eye condition. It was also apparently in the nature of impeachment, the court stating that "the questioning objected to by appellants [plaintiffs] followed testimony by Mrs. White to the effect that she had had no trouble with her right eye prior to this accident and that her right eye had not been injured."

In a later California case, *Coleman v. Southern Pac. Co.,* 141 Cal.App.2d 121, 133, 296 P.2d 386, 394 (1956), defendant sought to use evidence of settlements by the plaintiff on prior injuries. The court, after noting *LeBlanc,* said:

Under these circumstances, [where plaintiff admits prior injury] the amount of the prior settlement is of so little materiality for the purpose of showing the extent of the prior injury that this ground must be considered fictitious and it is so prejudicial in confusing the issues that exclusion may well be required.

The court ordered a retrial, but left the door open for possible admission of this evidence because "the evidence on retrial may differ from that received at this trial."

California has, therefore, adopted a case-by-case approach to admissibility. In *Alonzo v. With,* 214 Cal.App.2d 753, 760, 29 Cal.Rptr. 710, 714–5 (1963) the court said:

The issue at hand concerns the existence of a single or duplicate injury, rather than duplicate damages for a single injury. Whether or not the plaintiff's present low back condition was caused by the 1957 accident or by the subject accident is neither proved nor disproved by the amount of the 1957 settlement. The order of the trial court excluding the testimony given was proper.

In *Johnson v. Matson Navigation,* 163 Cal.App.2d 336, 338, 329 P.2d 375, 376–7 (1958) the court said:

It may well have been error for respondent to ask appellant whether he made a claim and received money for the previous injury [authority], but these questions were not objected to by appellant, and the *clearly erroneous* question as to the *amount* of the settlement was asked by appellant's own counsel. (Emphasis added.)

In *Ferriola v. Burdick,* 146 Conn. 574, 577, 153 A.2d 319, 320 (1959) the plaintiff admitted injuries in a prior accident. Questions asked over objection about the amount of recovery were held to be reversible error. The court said such testimony, not being proper for impeachment because plaintiff admitted the prior injury, was "completely irrelevant."

Other jurisdictions have split on this issue. *See* Annot. "Cross-Examination—Previous Condition," 69 A.L.R.2d 593.

■ We conclude that the better-reasoned authorities hold that evidence of the amount of prior settlements is inadmissible in the context of this case. There was no denial by plaintiff of any prior injuries. It is likely that the prior settlements included such items as loss of earnings and medical expense; and in the case of the plaintiff's tort claim, the additional items of pain and suffering. None of these would have a direct bearing on what injuries plaintiff had suffered which were still in existence at the time of his last injury.

The size of any verdict or settlement may vary according to factors having no bearing on the extent of residual injuries. For example, close issues of liability might diminish the recovery; shocking acts of recklessness or negligence might increase them. Disputed legal issues and other obvious factors, such as the ability of the claimant's attorney, could affect them.

The settlement figures brought out on cross-examination here were aggregations of all of these factors without any guidance for the jury to determine how much, if any, represented the residual injuries which defendants sought to establish. In addition to the lack of probative value of this evidence, it could cause a jury to consider plaintiff to be accident prone, or litigious, or both. *Lowenthal v. Mortimer,* 125 Cal.App.2d 636, 642–3, 270 P.2d 942, 945–6 (1954), concerned evidence of prior lawsuits by plaintiff. The court stated that "litigiousness, in the eyes of most people, reflects . . . upon character" and that "hostility [is] ordinarily felt against one who constantly requires services of a court of law for the adjustment of life's problems." The court held it was reversible error to allow evidence of the prior matters.

Appellees contend these matters could be properly admitted by the trial court in the exercise of its discretion as to the cross-examination, citing *Uhlenhopp v. Steege,* 233 Iowa 368, 7 N.W.2d 195 (1942) and *State v. Carney,* 236 N.W.2d 44 (Iowa 1975). These cases, however, recognize such discretion only as to the scope of cross-examination. They are not authority for a trial court's

allowance of irrelevant evidence. We said in *Carney* that "[a] reasonable latitude must be accorded a cross-examiner but the scope thereof as to *any proper subject of inquiry* rests generally in the trial court's sound discretion." (Emphasis added.) *State v. Carney,* 236 N.W.2d at 46. Recoveries for prior injuries here were not proper areas of inquiry, and could not be made so by the court even in the exercise of its discretion.

In *Eichel v. New York Cent. R.R.,* 375 U.S. 253, 84 S.Ct. 316, 11 L.Ed.2d 307 (1963), the defendant sought to show plaintiff's receipt of pension payments "for the purpose of impeaching [plaintiff's] testimony . . . as to his motive for not returning to work and as to the permanency of his injuries." Although this was a "collateral source" case, i.e., the third-party payments made were for the subject injury, the Supreme Court's language regarding probative value and prejudice is appropriate here. It said:

In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. 375 U.S. at 255, 84 S.Ct. at 317, 11 L.Ed.2d at 309.

Receipt of such evidence was held to be reversible error.

We adopt this reasoning as to the present case. Other evidence of pre-existing injuries with more probative value, e. g., medical testimony, would generally be available, and would involve less likelihood of prejudice. We hold it was error to admit the evidence of prior claims, settlements and worker's compensation here.

The verdict of the jury, while it was for plaintiff, was for less than the amount of his claim for lost income and medical expense prior to trial. Under this record, there is sufficient likelihood of prejudice to plaintiff to require granting a new trial.

The case is therefore reversed and remanded for a new trial.

REVERSED AND REMANDED.

All Justices concur except UHLENHOPP, LeGRAND and ALLBEE, JJ., who dissent.

UHLENHOPP, Justice (dissenting).

In my view the trial court did not abuse its discretion in permitting cross-examination regarding sums received for prior injuries and regarding tax returns, or in admitting a doctor's report into evidence. The collateral source rule is not involved; the case involves a question of *causation.*

I. *Prior Claims, Settlements, Awards.* The initial issue relates to the admissibility of prior claims and collections. The factual setting must be taken into account. The suit arises out of a motor vehicle collision on June 3, 1975. The *first* point is that plaintiff Nepple claims he sustained very serious injuries as a result of that collision; he seeks $247,000 in damages. A doctor testified, for example, that Nepple related the following history of his condition after this accident:

The patient then also told me that after he regained consciousness, at least that he was able to recollect, that he noticed some impairment in his eyesight, right. He has an artificial eye on the left. He also had at that time some laceration at the left forehead, and he told me that he had a broken right lower arm and also some injury to the right lower leg and—and he was complaining of pain sensation in the cheek on the left side; and also, he had some pain radiating into the right upper arm.

Furthermore, he told me that ever since this accident, he had been complaining of pain in the back of his head, but also frontal headaches; and he said that the pain in the back of the head is at the head-neck junction. When I asked him, furthermore, he said that he has considerable soreness and pain at the head-neck junction and also in the forehead area.

The doctor testified regarding a later examination:

Patient still has been complaining of the blurred vision off and on, and—and

he said that his headaches, that it is mostly originating from the head-neck junction, is practically there constantly. I—I— He also is still complaining of pain in the right shoulder joint off and on and also is still noticing impairment of the range of motion of the right shoulder joint.

The doctor testified regarding subsequent treatment of Nepple:

I did an electrical denaturation to the area of the greater occipital nerves on both sides, which means I did a destruction with high frequency at the head-neck junction. And I did six destructive lesions on the right side and five destructive lesions on the left side, a total of eleven destructive lesions with high frequency.

This is a procedure in which an electrical needle is being placed underneath the skin over the occipital bone; and with a high frequency radio-frequency equipment, one is getting the—the wave activity into the tip of this electrical thermoneedle, and one is then destroying the—the particular area.

The *second* point is that Nepple sustained injuries on three prior occasions. The first was in 1969. He testified on direct examination regarding that incident:

Q. There's been some discussion here that you were in an accident. Tell these people about it. A. Fell off of a ladder.

. . .

Q. How far did you fall? A. Ten foot.

Q. Well, what happened to you? A. I laid on the retaining wall. With my head I had a hard hat on.

And on cross-examination:

Q. Now, did you have any injuries prior to the time that you went to work for Rotert Construction Company? . . A. Yes, in '69 I did. I had a—my skull was busted up here (indicating). . . .

Q. Your skull was fractured? A. Oh, yes.

The second injury was in the fall of 1973. Nepple testified with respect to that occasion:

Q. Now, while you were working for [Rotert] in the fall of '73, were you riding in a pickup truck that was involved in a wreck? A. Yes. . . .

Q. And did you sustain any injuries in that accident? A. Neck injuries . . . .

Q. What part of your neck? A. At the base of the skull.

The third injury was in December 1973. Nepple testified on cross-examination:

Q. In December of '73, did you consult a doctor regarding a freezing of your right hand? A. Yes, I did.

Q. And did you go off work by reason of that? A. Yes, I did.

Q. For how long a period? A. Three weeks, sir.

At this juncture the damage issue in the case comes sharply into focus: to what extent if any were Nepple's present injuries attributable to the prior injuries and to what extent if any were they attributable to the 1975 collision on which this suit is based?

The *third* point is that Nepple endeavored to downplay his prior injuries rather than to seize the initiative and introduce the evidence about their aftereffects. For example, he testified that after the 1969 accident he was in the hospital a week or ten days, went back to work that fall, shingled, did finish work, and carried blocks—obviously endeavoring to create the inference that he was rehabilitated and without delineating the aftereffects he was suffering. The same is true regarding the injury in the fall of 1973; he testified that he was in the hospital ten days, recuperated at home four to five weeks, and returned to work for Rotert Construction on hog confinements, again giving the impression of rehabilitation. Moreover, he was asked on direct examination whether he previously "injured" his right hand and responded, "No, I didn't," without mentioning the freezing incident which was of sufficient severity to enable him to collect compensation. He testified some of his prior injuries were only temporary and others he denied, contrary to

his own doctor's report set out infra. In sum, Nepple's testimony would leave the impression that the effects of any prior injuries were a thing of the past at the time of the collision on June 3, 1975.

The *fourth* point is that according to his own treating doctor, Nepple was still suffering from prior injuries about five weeks before the present collision, of the same nature as he now asserts. The report of his doctor, Horst Blume, admitted into evidence on defendants' offer over Nepple's objection, states:

A. Date, 4–28th of 1975. The patient still has difficulties with his memory, and he said when he has head pain, then he has memory lapses. When his fore— when his foreman tells him what to do; then he cannot follow the instructions all the way through.

When he feels good, then he has four or five men working for him. The patient said during the last month when he had four—there have been four times they could not tell him what to do so that he would understand, and there are two days when he did not work. The patient said when he has the pressure at the back of the head on the right side, then he cannot follow orders.

If the pain at the back of the head is intense, then he has pain in the right eye. The patient also notices ringing of both ears when he has the headaches. He takes two aspirin every four hours until the pain subsides, but never more than eight aspirin a day.

The patient said the medication I prescribed helped him while he was on it, but when he was off the medication, the pain was back again. The patient received about two dozen treatments at a local hospital, which did not help him. The patient still cannot hold the hammer in his right hand because of inability to control the hand. He does not drive company vehicles because of the dizziness.

The patient has trouble with his balance and is frequently running into doorways because of unsteadiness. The patient has requested not to be on ladders at work because of the unsteadiness. The patient cannot hold securely with the right hand, so when striking with a hammer, it flies out of his hand. The patient thinks the rhizotomy helped him in the beginning, but not in the long run.

When I asked the patient about his impaired memory and said this may be related to his age, the patient definitely denied it. The patient said he had no mental impairment from the accident in 1969.

When the patient has the headaches, then it is worse in regard to his mental function, but he also notices impairment of his mental function without any headaches, but it is not bothering him as much. The patient said that his memory is impaired even when he does not have headaches. He has also noticed the hearing is impaired, and he thinks the right side is the worst.

Examination of the cervical spine revealed considerable local tenderness at the head-neck junction, right; otherwise, no significant local tenderness over the spine observed. The range of motion on the cervical spine is close to normal and does not cause any pain on movements. Sensory examination of the upper extremities revealed normal sensation in the hands and arms. The patient is able to squeeze 70 pounds with the left hand and 40 pounds with the right.

The patient is right-handed, but now works with the left as the right is now supporting him—is not supporting him properly. No evidence of stereodysgnosia. The patient can hear whispering at two yards in the right and five yards left. The right eardrum shows minimal scarring with a short reflex; also, considerable scarring seen left.

I would advise the patient to have another denaturation-rhizotomy procedure on the right side, since it helped in the beginning. I would be—he would be a good candidate for a repeat procedure since the first time I only made two lesions.

The patient agreed to have the procedure repeated in order to try to control most of his pain, even though he was told 25 percent of the patients may not improve at all. The patient should have a hearing test at the Rehabilitation Center.

To take one example from this report, Nepple introduced evidence, already quoted, of electrical denaturation of the area of the greater occipital nerves *after* the present collision. The doctor's report discloses the doctor had performed a similar procedure *before* this collision *and was then contemplating a repeat of it*: "I would advise the patient to have another denaturation-rhizotomy procedure on the right side, since it helped in the beginning. I would be—he would be a good candidate for a repeat procedure since the first time I only made two lesions."

The *fifth* point is that Nepple's testimony creating the impression of rehabilitation from prior injuries and his doctor's report of continuing physical difficulties before this collision made the nature, extent, and seriousness of the three prior injuries highly relevant in order to allocate Nepple's present problems between the prior injuries and the injuries in the 1975 collision. I think that defendants should be permitted to establish the nature and extent of the prior injuries in any relevant way. Thus the tort damages and compensation benefits Nepple claimed and collected are relevant regarding the nature, extent, and duration of the prior injuries as he claimed them to be at the time. When the nature of a person's prior injuries becomes the inquiry in a case, the person's prior claims and collections regarding those very injuries constitute admissions by him as to how he regarded the injuries at the time, despite his present protestations. Any other rule would permit a claimant who has received a substantial sum on a large claim for a prior injury to minimize that injury while testifying, secure in the knowledge that he could not be compelled to disclose his prior claims and collections for that injury. The jurors should be allowed to know the full facts about relevant prior injuries and the position the claimant took about them at the time, to the end that they can sift out the truth and find how much if any of the claimant's present difficulties are attributable to the accident in suit.

The Supreme Court of Minnesota aptly stated in *Kelsey v. Chicago, R. I. & P. R. R.*, 264 Minn. 49, 55, 56, 117 N.W.2d 559, 563:

Plaintiff urges that the order granting a new trial should be sustained on the ground that the trial court erroneously admitted evidence of the amount of money plaintiff received in settlement of an earlier, similar injury. It was established that in 1958, plaintiff had been in defendant's employ and that as a result of an injury, plaintiff resigned from his employment and was paid $15,000 in settlement of all claims arising out of that earlier injury. The earlier injury was to the same area of plaintiff's back as the injury for which he now claims recompense. .

Plaintiff contends that the admission of the recovery was inadmissible and prejudicial . . . . Defendant answers that the evidence was admissible on the issue of damages on plaintiff's claim for an aggravation of a preexisting injury. We agree with defendant. The record is clear that such evidence was not injected to show fraud . . . nor was it unrelated to the amount of damages as in insurance recovery cases such as *Prescott v. Swanson*, 197 Minn. 325, 267 N.W. 251. The instructions of the trial court clearly submitted a claim by plaintiff for aggravation of a preexisting injury to his back. In view of this, it was perfectly proper for defendant to bring out before the jury, in mitigation of that claim, the nature and extent of plaintiff's previous back injury. This would include the amount that he was paid in settlement therefor. What influence adverse to plaintiff this evidence may have had is indeed speculative since the jury need not have reached the question of damages. If there was any adverse influence, any such effect could have been diminished or erased if plaintiff had availed himself of the opportunity he had to explain the

precise nature of his previous injury as well as the terms of the settlement. Applying the rule of relevancy in admitting evidence is an exercise of discretion by the trial court. We find no prejudicial abuse of such discretionary power which would justify a new trial in this case.

Cases in similar vein include *LeBlanc v. Browne*, 78 Cal.App.2d 63, 177 P.2d 347 (cross-examination regarding action for $18,000 for prior injuries and settlement for $2250); *Ludwig v. J. J. Newberry Co.*, 78 Ga.App. 871, 52 S.E.2d 485 (cross-examination about claim for prior injuries); *Jackson v. Thompson*, 358 Mo. 1001, 218 S.W.2d 97 (cross-examination about payment for prior injury); *Zimmerman v. Lindblad*, 154 Neb. 453, 48 N.W.2d 415 (cross-examination about worker's compensation award for prior injury); *Twilleager v. Modin*, 240 Or. 69, 398 P.2d 181 (cross-examination about litigation regarding prior injury); *Jones v. St. John*, 178 S.W.2d 181 (Tex.Civ.App.) (cross-examination regarding litigation pertaining to prior injury). These decisions enunciate a specific application of the general principle stated thus in 81 Am.Jur.2d Witnesses § 488 at 494–495:

> It has generally been held or recognized, in a number of cases, that the plaintiff in a personal injury action may be cross-examined as to his previous injuries, physical condition, or claims or actions for injuries of a nature similar to those involved in the case at bar for the purpose of showing that his present physical condition is not the result of the accident sued on, but was caused, wholly, or partially, by an earlier injury or preexisting condition. The reasoning underlying this recognition of the propriety of such cross-examination is that such evidence is pertinent to the issue of the plaintiff's present physical condition and is admissible in respect of the matter of damages, because the defendant is liable only for injuries produced by his negligence and the residual effect of a prior injury might materially reduce the amount of damages assessed against him.

This issue involves the relevancy of prior claims, payments, and awards on the question of the severity of prior injuries. We have said, "A determination as to the relevancy and materiality of evidence rests largely in the trial court's discretion." *Hagenson v. United Tel. Co.*, 209 N.W.2d 76, 80 (Iowa). The trial court here heard all the evidence and permitted this evidence regarding the prior injuries to be admitted. I am not willing to say the court abused its discretion.

II. *Tax Returns.* Nepple introduced some of his income tax returns into evidence and the parties got into a disagreement about medical expenses shown on them. Defendants desired to show that Nepple had medical expenses, as bearing on their contention that his prior injuries persevered. They wished to establish that such expenses were not shown on the returns because Nepple did not pay them himself. The trial court allowed defendants so to question Nepple on cross-examination as to 1974 and also 1975 up to June 3. Nepple answered over objection that such medical expenses were paid by workers' compensation.

The governing principle, as with relevancy, is that "The scope and extent of cross-examination lie largely within the discretion of the trial court." *Berding v. Thada*, 243 N.W.2d 857, 861 (Iowa). The trial court did not abuse its discretion in allowing this cross-examination. Testimony regarding medical expenses incurred for prior injuries was relevant as corroborating defendants' contention regarding the severity of those injuries, and the returns alone would create the impression of absence of such expenses without a further explanation that such expenses existed but were paid by others.

III. *Doctor's Report.* Nepple tried throughout the trial to keep out of evidence his doctor's report of April 28, 1975, previously quoted.

The parties took Dr. Blume's testimony by video-tape deposition prior to trial. At the deposition Nepple asked the doctor on redirect examination:

Q. Doctor, did this man ever have any injury to his hand before the accident of June 3rd, 1975, that you ever saw? A. No, he didn't have.

Q. After you treated him for the neck junction difficulty that he had before June 3rd of 1975, did you make notes in your records and your report dated May 3rd, 1976, which you and Mr. Kohorst have been talking about, as to when he started having the problems again in that area? And if so, what date did you say that it actually started over again? A. That's the report of 5–3–1976 and—What are you referring to?

Q. My question was: do you have in your own notes when the pain started over again in reference to any date? Second paragraph from the bottom. A. Oh, I said, "Actually, he had the other accident on June 3rd, 1975, and it started over again," referring to the pain at the head-neck junction.

Q. After you treated him for whatever difficulty he had in 1973, was he able to go back to work? A. Yes.

Q. *And did he have any further difficulty that required your attention?* A. *No.* (Italics added.)

On recross-examination at the deposition, defendants then brought forth Dr. Blume's report of April 28, 1975, and asked him to read it. He read it aloud as previously quoted. Nepple did not conduct redirect examination regarding the report.

At trial Nepple introduced into evidence substantial portions of Dr. Blume's deposition testimony, including the redirect examination just quoted. Defendants thereupon sought to introduce the recross-examination covering the April 1975 report, but the trial court upheld Nepple's objection of improper recross-examination. Later in the trial, during defendants' case-in-chief, the court permitted defendants to introduce the recross-examination covering the April 1975 report. As to *cross-examination by Nepple at trial* with respect to this testimony, the following occurred:

The Court: Mr. Wunschel [Nepple's attorney], what is your wish in regard to cross-examination in this matter?

Mr. Wunschel: Of course, at this point I don't know whether the doctor is or is not available, Your Honor, which you can appreciate. In all probability we will have none because I suspect he is very busy.

The Court: I didn't hear what you said.

Mr. Wunschel: I suspect we will have none because I suspect he is very busy and unavailable.

The Court: Do you want some time to check that now?

Mr. Wunschel: No, I think we will just waive it at this point—or will not waive but we will just not try to do it because of the time element.

The Court: All right. Will there be any rebuttal?

Mr. Wunschel: I'm sorry?

The Court: Will there be any rebuttal?

Mr. Wunschel: No, I don't think we'll try to recall him or anything so I think we'll just rest at this time, Your Honor. I think it would be unfair to him.

Nepple argues on appeal that the trial court should not have admitted into evidence the recross-examination regarding Dr. Blume's report of April 28, 1975. That testimony was of course highly relevant as to whether Nepple was presently suffering from his prior injuries. Nepple's failure to conduct further redirect examination at the deposition was his self-inflicted problem; he had his opportunity to examine further at the deposition and did not do so.

The trial court did not err in admitting the deposition recross-examination during defendants' evidence at trial because the court could have permitted this testimony into evidence when offered originally by defendants on cross-examination during Nepple's case-in-chief. This testimony dealt with the *subject* of Nepple's direct examination of Dr. Blume. True, this was recross-examination, not original cross-examination. But trial courts have discretion to admit recross-examination on a subject dealt with on the direct examination even though the subject is not raised on redirect

examination. 81 Am.Jur.2d Witnesses § 508 at 514 ("the privilege of recross-examination as to matters not covered on redirect examination lies within the trial court's discretion, which will not be disturbed by a reviewing court unless the discretion has been abused"); 98 C.J.S. Witnesses § 429 at 238–239 ("whether a party is to be granted the privilege of reopening on recross-examination a subject not reopened on redirect examination is within the discretion of the trial court, and the court, in the exercise of its discretion, may permit such a question"). See *State v. Wheelock*, 218 Iowa 178, 254 N.W. 313.

This case however goes a step farther: the subject of the recross-examination was also dealt with by Nepple on redirect examination. On redirect examination Nepple asked Dr. Blume whether his May 3, 1976 report notes when Nepple started having problems again in the neck area. Dr. Blume responded, "Oh, I said, 'Actually, he had the other accident on June 3rd, 1975, and it started over again,' referring to the pain at the head-neck junction." Nepple then asked if he was able to go back to work after the 1973 difficulty, and Dr.

Blume answered yes. Nepple thereupon asked, "And did he have any further difficulty that required your attention?", and the doctor answered, "No." This opened wide the door to recross-examination on Dr. Blume's contradictory report that Nepple was having difficulty as of April 28, 1975.

Cross-examination need not merely parrot the direct or redirect examination. It may deal with the *subjects* of that examination. *Avery v. Harms Implement Co.*, 270 N.W.2d 646 (Iowa). As we stated in the case of *In re Estate of Poulos*, 229 N.W.2d 721, 725 (Iowa), "A witness may be cross-examined on subjects directly and indirectly brought out on direct examination. This includes the right to rebut inferences and deductions sought to be established on direct examination."

No error appears in the admission of Dr. Blume's deposition recross-examination.

I think the trial court did not abuse its discretion in this case and I would affirm the judgment.

LeGRAND and ALLBEE, JJ., join in this dissent.